## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MARIE PATTERSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **CIVIL ACTION NO. 18-00492-JB-MU** |
| **GEORGIA PACIFIC, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### ORDER

On February 8-9, 2024, this matter came before the Court for a bench trial on Plaintiff Marie Patterson's ("Ms. Patterson") claims against Defendants Georgia Pacific, LLC ("Georgia Pacific") and Alabama River Cellulose, LLC ("ARC"). Ms. Patterson alleges Defendants retaliated against her in violation of the terms and conditions of her employment and in violation of Title VII of the Civil Rights Act. Defendants deny Ms. Patterson's allegations and contend she was terminated for cause. Defendants assert as an affirmative defense that, during the course of this litigation, they learned Ms. Patterson made material misrepresentations about her work experience when she was hired. According to Defendants, these misrepresentations were so significant that Ms. Patterson would have been terminated on those grounds alone had this information been known during her employment.

During the trial, the parties offered live testimony from Ms. Patterson, Timothy McIlwain, Megan Sirna and Sharon Siemens. The parties also submitted deposition excerpts of Jeff

Hawkins, Tim Covington, Stan Cumbie, Terrence Rice, Tommy Blaylock, and Terrence Reed.[1] After due consideration of the witnesses' testimony, other evidence presented, and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I.      ISSUES TO BE DETERMINED AT TRIAL

The present action before the Court is a single count of retaliation in violation of Title VII of the Civil Rights Act. Ms. Patterson alleges she was terminated from her employment after testifying in a deposition against her former employer Memorial Hermann in a pregnancy discrimination lawsuit wherein Memorial Hermann was sued by three former employees. Defendants maintain Ms. Patterson was terminated for attendance and performance-related issues ultimately resulting in a lack of confidence in her abilities.

Defendants also assert the affirmative defense of after-acquired evidence in this case. Defendants contend that through the course of this litigation, they became aware of evidence of wrongdoing such that Ms. Patterson would have been terminated on those grounds alone had it known of it at the time of the discharge. *See, e.g. Thomas v. Home Depot U.S.A., Inc.*, 792 F.Appx 722, 725 (11th Cir. 2019)("If a plaintiff satisfies his burden of proving unlawful discrimination under Title VII, the employer may assert – as an affirmative defense – that plaintiff's damages are limited by after-acquired evidence that plaintiff misrepresented information on his job application.").

---

[1] Ms. Patterson asked the Court to read excerpts of the deposition of Megan Sirna, however because Ms. Sirna was called as a live witness in Defendants' case-in-chief, the Court did not consider the excerpts of her deposition. Ms. Patterson also submitted excerpts of her own deposition to the Court. (Doc. 234). Because Ms. Patterson as a live witness, the Court did not consider the excerpts of her deposition.

II.    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The parties agreed on seven stipulated statements of fact.  The Court adopts these stipulations and they are as follows:

**A. Stipulated Facts:**

1.  The parties agree that Ms. Patterson is an African American female and therefore she is a member of a protected class pursuant to Title VII of the Civil Rights Act.

2.   The Parties agree that Ms. Patterson suffered an adverse employment action in that her employment was terminated.

3.  The Parties agree Ms. Patterson submitted an employment application to Defendants. The employment application states: "By my signature on this Employment Application, I certify that all information furnished by me and in any resume I have supplied, is true, complete and correct. I agree that any false statement made by me, or my failure to answer completely any application questions may result in release from, or refusal of employment."

4.  The Parties agree Ms. Patterson submitted a resume in support of her employment application. Ms. Patterson's resume states that from May 1994 to November 1999, she was a "Business Manager, Operations" for the "Fresno Economics Opportunity Commission."

5.  The parties agree that both the employment application and resume reflect that Ms. Patterson worked at "APF Manufacturing" as "Director" of Human Resources from July 2002 to August 2013 and worked in the U.S. Department of the Army as a "Director" from December 1999 to July 2002.

6. The Parties agree that neither the employment application nor the resume reference Ms. Patterson's employment with the Houston Independent School District.

7. The parties agree that neither Ms. Patterson's resume nor application indicate an employer from July 2002 to August 2013 other than "APF Manufacturing."

**B. Witnesses for the Plaintiff**

Ms. Patterson's case in chief consisted of testimony from eight witnesses. Ms. Patterson and Megan Sirna testified before the Court in person and the remaining witnesses testified via deposition. The Court summarizes the testimony of each witness in turn.

**1. *Jacquline Patterson.***

Ms. Patterson was the first witness to testify. Ms. Patterson applied for and was hired in December 2015 as Senior Human Resources Manager assigned to the ARC mill in Purdue Hill, Alabama. Ms. Patterson began working in February 2016. ARC, is a Georgia Pacific Mill managed by General Manager Timothy McIlwain.[2]  When initially hired, Ms. Patterson's direct supervisor was Terrance Reed. During the summer of 2016, Jeff Hawkins became her direct supervisor. Both Mr. Reed and Mr. Hawkins worked from Georgia-Pacific's main office in Atlanta, Georgia.

Ms. Patterson testified that she received a deposition notice in a case against her former employer, (Memorial Hermann) for a deposition scheduled for June 29th in Pensacola, Florida. Ms. Patterson received this notice on June 8th and testified that she never shared the deposition notice with anyone with Georgia Pacific. On another occasion during her testimony, Ms. Patterson testified that she told Jesse Jackson she was going to be away from the mill on June

---

[2] Defendants describe Mr. McIlwain's role at the ARC mill as Ms. Patterson's "dotted line" supervisor. In other words, Mr. McIlwain was a secondary supervisor of Ms. Patterson, providing additional oversight and guidance for the execution of her work at ARC.

29th for a deposition. Ms. Jackson put the deposition on the calendar but did not include any specifics about the deposition. Ms. Patterson also testified that she communicated information about this deposition to Jeff Hawkins, her supervisor, as well as Stan Cumbie.

Ms. Patterson contends that on June 22nd, she spoke with Jeff Hawkins while she was driving her dog to an appointment in Tuskegee, Alabama. During this conversation, they discussed many topics including Ms. Patterson's appearance as a company representative at a deposition on June 27th in Jackson, AL. Ms. Patterson testified that she reminded Mr. Hawkins that she would be away from the mill at a deposition in Pensacola on June 29th.

While driving to Pensacola on June 29th, Ms. Patterson received a call from Jeff Hawkins. During this call they discussed Tim McIlwain's report of union activity at the mill. Mr. Hawkins wanted Ms. Patterson to schedule a meeting so they could confer with other relevant stakeholders about how to respond to the threat of union activity. Ms. Patterson reminded Mr. Hawkins about her deposition and said she would be unable to step away from the deposition to participate in a meeting. Mr. Hawkins asked Ms. Patterson to schedule the meeting "as soon as possible." Later that day, Mr. Hawkins sent an e-mail scheduling a meeting for June 30th.

Ms. Patterson participated in the meeting on June 30th. During the meeting Ms. Patterson was tasked to develop a compensation analysis so management could evaluate wage increases for the employees. Ms. Patterson testified that she had been working on this analysis and had in fact already completed it in September of 2016. According to Ms. Patterson, no deadline was assigned for her work on this project.

Ms. Patterson came to the mill on July 3rd (Monday) even though she was planning to be on vacation for the week. Ms. Patterson maintains that she provided her supervisors with notice

of this vacation and that it was on the calendar. Ms. Patterson also testified that during her vacation week she continued to work on the compensation analysis. Ms. Patterson testified that she worked with "Tommy and Amanda" during her vacation. Ms. Patterson did not indicate that she worked on the project with Tim McIlwain. Ms. Patterson testified that while she was on the way back from her vacation, Mr. Hawkins called her and she shared with him all the work she had been doing that week. Ms. Patterson testified that Mr. Hawkins appreciated the update and indicated that "we are on track." After returning to work, Mr. Hawkins called Ms. Patterson and asked her questions about the deposition in Florida.

On July 11 or 12, Mr. Hawkins visited Ms. Patterson's office at the mill to question her in more detail about the Florida deposition. Ms. Patterson believes that Tim McIlwain asked Mr. Hawkins to inquire about the deposition. Ms. Patterson related that she testified on behalf of three ladies who were on FMLA related to their pregnancies and were discharged from their employment during that leave. According to Ms. Patterson, Mr. Hawkins specifically asked her if she testified against her former employer. When she answered yes, Mr. Hawkins said "that makes things clear to me."

Mr. Hawkins and Mr. McIlwain visited Ms. Patterson's office together on July 18th. According to Ms. Patterson, they walked into the room and handed her an envelope. At the same time, Ms. Patterson handed them a completed copy of the compensation analysis project she was assigned on June 30th. According to Ms. Patterson, Mr. Hawkins said nothing and simply handed her the envelope. She opened the envelope and read the letter which was a proposed severance agreement. At this point, Ms. Patterson realized she was being terminated. According to Ms. Patterson, she knew immediately that it was the Florida deposition that precipitated this

6

termination. Ms. Patterson knew it could not be the union avoidance work because she had just handed in the completed work and it was "on schedule."

According to Ms. Patterson, she did not learn the actual reasons for her termination until she received the company response to her EEOC charge. During the termination meeting, Ms. Patterson asked for specific reasons for her termination, but none were given. The only matter discussed according to Ms. Patterson was a relocation allowance, which was denied.

Ms. Patterson explained that according to the EEOC response, Mr. Hawkins determined Ms. Patterson missed 14 days of work during the month of June and that she did not complete her work on the union avoidance efforts as expected. Ms. Patterson testified that she had no warning that any of her conduct at work was problematic or could result in her termination. Ms. Patterson testified that it was typical company policy to provide employees with notice of conduct that could produce a termination and afford them an opportunity to change their behavior. She also believed her termination was unusual because despite being terminated for cause she was offered a severance package.

On cross examination, Ms. Patterson admitted she selected Pensacola as the location for her deposition in the Memorial Hermann case even though she lived in Monroeville, Alabama. Ms. Patterson selected Pensacola because she has family living there.

Ms. Patterson was questioned about the job application and resume she provided to Georgia Pacific at the time of her hiring. Ms. Patterson admitted that her resume does not include some of her previous jobs. For instance, she did not include her work as a food services trainer for the Houston Independent School District from August 2007 to August 2010. Her resume also did not include her employment as program director for special education with the West Baton

Rouge Head Start Program. Ms. Patterson worked for the Head Start Program from 2002 to 2007.[3] Ms. Patterson testified she worked full time for the Houston Independent School District as well as the West Baton Rouge Head Start Program, even though her resume represents that she was also working full time for APF Manufacturing as Director of Human Resources from July 2002 to August 2013. Ms. Patterson explained that she felt the omitted jobs were not relevant to her application with Georgia Pacific and that's why she didn't list them on her resume. Ms. Patterson maintains she worked full time for Houston Independent School District, the Baton Rouge Head Start, and APF Manufacturing (and/or APF Consulting) at the same time. She worked these multiple jobs, despite the fact that they are located far from each other. According to Ms. Patterson, she was able to work for Houston Independent School District and the East Baton Rouge Head Start during normal working hours and then work full time for APF as Director of HR during other hours of the day.[4]

Ms. Patterson admitted she owns several companies incorporating the letters APF in their names. These companies include APF Service Business Solutions LLC and APF Services at the same time she was allegedly working for APF Manufacturing and/or APF Consulting. According to Ms. Patterson, the similar names are merely coincidental. Ms. Patterson did agree that if she had not actually worked for APF Manufacturing or APF Consulting as Director of Human Relations, her work at Memorial Hermann would have been her only HR experience.

---

[3] In Defendants' Exhibit 31, which is Ms. Patterson's supplemental response to discovery, her response includes an additional employment left off the resume called "Yuma Regional" where Ms. Patterson was a "business partner" for two months from August 2013 to October 2013. Curiously, the address for this employer is listed as the same address in LaPlace, Louisiana for the "APF" entities.

[4] Ms. Patterson also worked for Memorial Hermann in Houston from December 2013 through February 2015.

Ms. Patterson was hired by Georgia Pacific in December of 2015 and started working on site in February of 2016. Sometime later in 2016, Jeff Hawkins became her supervisor. Mr. Hawkins had supervised Ms. Patterson for only a few months before her November 2016 review of her performance. Ms. Patterson acknowledged that her sense of urgency was identified as needing improvement and that her roles and responsibilities document[5] would require her to be present at the mill site during her work. Ms. Patterson testified that no one ever told her she was in violation of the employee handbook or that she was failing to provide the expected level of service to the company.

Ms. Patterson contends that the meeting she participated in on July 3rd was just a meeting with her and her subordinate employee Amanda. Once that meeting was completed Ms. Patterson left the mill at 11:03 and went on vacation. Ms. Patterson agreed that she did not take a vacation day on the day she travelled to Pensacola to testify in the memorial Hermann case.

Ms. Patterson admitted she did not complete the union avoidance project. Ms. Patterson acknowledges receiving an e-mail from Mr. Hawkins on July 12th. That e-mail states "Tim has put together an initial base wage document." Shortly after receiving that email, Ms. Patterson turned in a draft of her portion of the wage comparison later on July 12th. Ms. Patterson believes Mr. Hawkins did not convey the urgency of the union avoidance project.

Ms. Patterson maintains that on July 12th Mr. Hawkins questioned her regarding the Memorial Hermann deposition. Ms. Patterson agreed that Mr. Hawkins asked her to schedule the meeting "as soon as possible." He then took it upon himself to schedule the meeting for July

---

[5] The roles and responsibilities document is a job description for Ms. Patterson that she prepared along with her supervisor Mr. Hawkins.

30th. Ms. Patterson testified that no hard deadlines were conveyed for the work she was supposed to do with Tim McIlwain. Ms. Patterson contends that she and Mr. McIlwain had already worked on the base wage document and that there was no expectation of her completing any work before she submitted it on July 12th.

### 2. *Megan Sirna*.[6]

Ms. Sirna testified that she reviewed Ms. Patterson's resume and identified the HR experience referenced in that resume. According to Ms. Sirna, Ms. Patterson would not have been hired for the Senior HR Manager position with Georgia Pacific if she did not have that experience listed on her resume. Ms. Sirna also testified that if the information contained in Ms. Patterson's application and resume were untrue, she would have been terminated based on the company integrity and misrepresentation policies.

According to Ms. Sirna, during the month of June, 2017, questions began to arise regarding Ms. Patterson's absences from the mill and her trustworthiness. In looking into these questions, Ms. Sirna and Mr. Hawkins considered the ARC mill's gate security records, conversations with people working on site in the mill, Ms. Patterson's limited participation in the union avoidance work as well as the fact that Ms. Patterson was not at work when it was expected she would be. Additionally, it was Ms. Sirna's conclusion that there was not a strong enough relationship between mill management and HR, specifically Ms. Patterson.

Ms. Sirna was not aware of Ms. Patterson's participation in a deposition involving her former employer until Ms. Patterson's EEOC charge was filed. Ms. Sirna recalled that Mr. Hawkins

---

[6] Ms. Patterson intended to call Megan Sirna via deposition, but Defendants called her as a live witness, so the Court explained to Ms. Patterson that, because she appeared to testify in person, only Ms. Sirna's live testimony would be considered by the Court.

told her Ms. Patterson was at a deposition away from the mill that he believed was related to work for Georgia Pacific. This is the reason Mr. Hawkins was surprised Ms. Patterson would not be able to step out for the important union avoidance meeting. Ms. Sirna testified that she was not aware of any code of conduct warnings given to Ms. Patterson.

> **3.** *Jeffrey Hawkins***.**

Both parties offered testimony from Jeffrey Hawkins.  Mr. Hawkins was hired by Georgia Pacific in June 2016 as the Director of Human Relations. In this role, Mr. Hawkins was Ms. Patterson's direct supervisor. In November 2017 Ms. Patterson received an employee evaluation from Mr. Hawkins. While her work was generally ok, the evaluation recognized "opportunities" to improve her focus and priorities as well has her relationship with the ARC mill management team.

Mr. Hawkins became aware Ms. Patterson was spending a lot of time away from the mill and Ann Olson, an HR Manager at a sister facility, was experiencing some difficulty scheduling meetings with her. After a similar report concerning Ms. Patterson from plant manager Tim McIlwain, who also reported that he had discussed his concerns about union activities, Mr. Hawkins decided to conduct an informal investigation[7] and asked Michelle Mayton to access the gate security log so he could review Ms. Patterson's comings and goings from the mill. The gate log indicated Ms. Patterson was only present at the mill on 14 days during the month of June 2017. Mr. Hawkins also talked with HR employees Stan Cumbie, Jessie Jackson, Michelle Mayton as well as Plant Manager Tim McIlwain. These conversations confirmed Mr. Hawkins' concerns.

---

[7] Mr. Hawkins described a formal investigation as one that that was entered into the company investigation database and produced an "investigation file" and a report.

On June 28th Mr. Hawkins spoke with Ms. Patterson on her cell phone. Ms. Patterson was away from the mill taking her dog to a vet in Tuskegee, AL. Mr. Hawkins discussed previous day's deposition of Greg Prier Ms. Patterson had attended on June 27th as well as the union activity concerns expressed by Mr. McIlwain. Mr. Hawkins was surprised Ms. Patterson was aware of those concerns but had not brought it to him on her own. Mr. Hawkins asked Ms. Patterson to schedule a meeting the next day with a team to prepare a coordinated response to the union activity. Ms. Patterson reported that she would be in a deposition on the 29th and would be unable to step away from the deposition to participate in a meeting. Mr. Hawkins directed her to schedule the union avoidance meeting as soon as possible.

The importance of the union activity threat to the company left Mr. Hawkins expecting Ms. Patterson would immediately begin at least scheduling a meeting. On June 29th, when Ms. Patterson had failed to take appropriate action, Mr. Hawkins set the meeting up himself for the next day. On June 30th, the union avoidance meeting took place and Ms. Patterson attended. Everyone on the team was given an assignment for preparation of the response. Ms. Patterson was tasked with working with Tim McIlwain to prepare a compensation analysis of the ARC workers versus other mills in the area. This compensation analysis was due to be completed by July 7th, the next Friday. Unbeknownst to Mr. Hawkins, Ms. Patterson was planning to be on vacation during the week of July 4th. Ms. Patterson did return to the mill on Monday July 3rd for a follow up meeting, but she did not arrive until 9:08 and left just after 11:00. Mr. Hawkins and Mr. McIlwain had no further communication with Ms. Patterson during the week and, in the end, Mr. McIlwain prepared a compensation analysis himself.

Mr. Hawkins was on site at the mill on July 11th and had a discussion with Ms. Patterson. According to Mr. Hawkins, they discussed the gate security log and Ms. Patterson's absences from the mill without his knowledge during the month of June. Ms. Patterson explained the gate security log results were inaccurate because she was often waved around the security arm by a guard she knew. Mr. Hawkins indicated that badge scanning at the gate was both a security and a safety accountability concern. Mr. Hawkins considered Ms. Patterson's admission that she repeatedly violated the gate security protocol to end the need for further investigation into her absences, which he felt were substantiated. Going around the security gate was also considered a violation of company policy. Mr. Hawkins recalls that Ms. Patterson told him that she did not participate in the deposition on June 29th but rather spent the day in Pensacola with her family.

Because of the concerns raised by Mr. McIlwain, Ms. Patterson's multiple unannounced absences and her failure to timely participate in the union avoidance effort, Mr. Hawkins lost confidence in her ability to be a member of the ARC management team. Mr. Hawkins made the decision to terminate Ms. Patterson's employment. This decision was communicated to Ms. Patterson on July 19th at the mill. Mr. Hawkins testified that he was not actually aware that Ms. Patterson gave a deposition on June 29, or that she was the despondent in a case against her former employer, until the company received Ms. Patterson's EEOC charge. Mr. Hawkins testified that the company's response to the EEOC charge accurately reflects the reasons for Ms. Patterson's termination.

4.    *Tim Covington.*

Tim Covington was Vice President Labor Relations and Counsel for Georgia Pacific. During his testimony, Mr. Covington recalled participating in the union avoidance meeting on June 30,

2017. Mr. Covington recalled seeing a document called "2016-2017 ARC Union Avoidance" but Ms. Patterson did not show him a copy and it was neither offered nor introduced in this proceeding.

Defendants object to most of Ms. Patterson's deposition designations for Mr. Covington. These objections are well taken, however, even if the Court were to consider Ms. Patterson's designated testimony, it would not offer any support for her case.

   **5.    *Stan Cumbie*.**

Plaintiff has designated portions of several pages of Mr. Cumbie's deposition.  Mr. Cumbie worked in the HR team at the ARC mill. He was a Performance Development Leader in two different departments and then served in the HR Generalist role. The testimony designated by Ms. Patterson demonstrates that Mr. Cumbie knew Ms. Patterson's cell phone number and could have called her on her cell phone if she was needed when she was not physically present in the office. Mr. Cumbie could not remember one way or another if Ms. Patterson ever called into the office when she was away. Mr. Cumbie could not recall any specific time when Ms. Patterson was not in the office. Mr. Cumbie did recall Ms. Patterson may have had a daughter and there may have been some conversation about that daughter getting married. Mr. Cumbie cannot recall if Ms. Patterson attended that wedding.

On cross examination, Mr. Cumbie explained he currently serves as HR Manager in another mill. In the role of HR Manager, Mr. Cumbie works on site every day and working from home is not an option. He noted that his office and Ms. Patterson's office were very near each other at the ARC mill. From this location he would know when Ms. Patterson was not on site at

the mill. Mr. Cumbie recalled times at the ARC mill when he would need to consult with Ms. Patterson, but she was not onsite and available.

Defendants object to most of Ms. Patterson's deposition designations for Mr. Cumbie. These objections are well taken, however, even if the Court were to consider Ms. Patterson's designated testimony, it would not offer any support for her case.

### 6.    *Terrence Rice*.

Mr. Rice testified that the first time he met Ms. Patterson was in April 2017, when he shadowed an HR Audit at the ARC mill. This audit consisted of a review of HR functions and a general sensing of the culture at the mill. Mr. Rice also testified generally about the company's process for conducting formal investigations and the fact that the company has a computer program designed to collect documents and reports of formal investigations. Mr. Rice was asked about a form he signed requesting a deadline extension for the company response to Ms. Patterson's EEOC charge. Mr. Rice did not attend Ms. Patterson's termination meeting and did not personally witness any of the conversations.

Ms. Patterson designates deposition exhibits 1 through 3 for submission. Defendants object. Exhibits 1 and 2 were not on Ms. Patterson's trial exhibit list and no foundation has been offered. Exhibit 3 is the same as Exhibit 5 on Ms. Patterson's trial exhibit list but she did not offer this exhibit during trial and no appropriate foundation was offered in this deposition. Defendants' objections are sustained, and the exhibits will not be considered.

### 7.    *Tommy Blaylock*.

Plaintiff has designated portions of Mr. Blaylock's deposition.  Defendants object to most of these designations. Mr. Blaylock served as the Operations Manager for the ARC mill. Ms.

Patterson asked Mr. Blaylock to identify the gender of several employees who have no relation to the testimony introduced at trial. Mr. Blaylock shared his vague memory of the security gate at the entrance to the mill property, noting that it could be possible for multiple vehicles to "tailgate" through the gate.  Mr. Blaylock also confirmed that the training building was located outside the security perimeter. Mr. Blaylock's memory of his interactions with Ms. Patterson consisted of interacting at least weekly on personnel matters.

Ms. Patterson designates deposition exhibits 1 through 9 for submission. Defendants object. These exhibits were not on Ms. Patterson's trial exhibit list and no foundation has been offered. Defendants' objections are sustained, and the exhibits will not be considered.

8.    ***Terrence Reed***.

The Court finds that the excerpts of Mr. Reed's deposition selected by Ms. Patterson are irrelevant to the proceedings. Accordingly, the Court sustains Defendants' objections and Mr. Reed's testimony will not be considered.

C. **Witnesses for the Defendants**

The two additional witnesses called by the Defendants were Tim McIlwain and Sharon Siemens. The Court summarizes their testimony in turn.

1.    ***Tim McIlwain***.

Mr. McIlwain was the ARC mill manager during the time Ms. Patterson worked at the mill. Mr. McIlwain was a "dotted line" supervisor for Ms. Patterson. Georgia Pacific expected Mr. McIlwain and Ms. Patterson to develop a relationship and work together to improve the performance of the mill. It was Mr. McIlwain's expectation that Ms. Patterson would be present at the mill between 8:00 AM and 4:00 PM Monday through Friday. Mr. McIlwain was expected

to know if Ms. Patterson was going to be away from the mill. During the month of June 2017, Mr. McIlwain noticed Ms. Patterson was absent more than she was present. Mr. McIlwain requested records of Ms. Patterson's badge swipes at the security gate for the facility. Mr. McIlwain shared his concerns about Ms. Patterson's work habits with Mr. Hawkins. On June 28th, Mr. McIlwain also shared his concerns about potential union activity around the mill. Mr. McIlwain had previously shared his concerns with Ms. Patterson, but Ms. Patterson did not convey these concerns to Mr. Hawkins, who was consequently taken by surprise when Mr. McIlwain shared these concerns. Shortly after their conversation, Mr. Hawkins spoke with Ms. Patterson and confirmed she was aware of Mr. McIlwain's concerns but had not chosen to share them.

Mr. McIlwain was one of the participants in the June 30th union activity meeting. During the meeting, Ms. Patterson was tasked with conducting a compensation analysis to be completed on July 7th. This analysis was part of a response Ms. Patterson and Mr. McIlwain were tasked with completing. Mr. McIlwain recalled a follow up meeting on July 3rd with Ms. Patterson and he recalled having no further conversation with her regarding the project after the initial meeting. Mr. McIlwain tried to reach out to Ms. Patterson on several occasions during the 4th of July week but was unable to get a response. Because he heard nothing from Ms. Patterson. Mr. McIlwain gathered some old compensation data and updated it with the relevant facilities. Mr. McIlwain produced a plan that was ready to go into effect on July 10th. Mr. McIlwain was very frustrated by the lack of support from Ms. Patterson. Mr. McIlwain testified it was his impression this frustration and lack of participation in the union avoidance effort was a major part of Ms. Patterson's termination decision.

Mr. McIlwain talked about the performance of Ms. Patterson during the union avoidance work and her intermittent presence at the mill with Mr. Hawkins and Ms. Sirna. Mr. McIlwain testified that he did not believe Ms. Patterson was a good fit at the ARC mill. Mr. McIlwain recalled that during Ms. Patterson's termination meeting her performance issues were discussed. These issues included her attendance at the mill and her role in the union avoidance work. Mr. McIlwain testified that he was not aware of Ms. Patterson's vacation during the week of 4th of July. He would have expected to have been told she was going to be away from the mill.

2.    *Sharon Siemens.*

Sharon Siemens is a senior paralegal for the parent company of Georgia Pacific. During the pendency of this litigation, Ms. Siemens was involved in reviewing document production and document requests. While reviewing Ms. Patterson's supplemental initial disclosures (filed on July 11th, 2019) Ms. Siemens discovered the deposition notice sent to Ms. Patterson in the Memorial Hermann case. Ms. Siemens followed up with counsel for Memorial Hermann, discovering Memorial Hermann believed Ms. Patterson had fabricated her experience and employment history in her application for employment. Ms. Siemens investigated and developed evidence suggesting Ms. Patterson's purported employment with APF manufacturing and APF Consulting were impossible to verify. Further, Ms. Siemens discovered documents filed with the Louisiana Secretary of State reflecting Ms. Patterson owned several entities incorporating the name "APF." Based on this investigation Georgia Pacific concluded Ms. Patterson had fabricated her work history and that her resume and employment application were deliberately untruthful. Ms. Patterson had no response to the testimony of Ms. Siemens.

**D. Court's Determinations of fact**

After reviewing the testimony and documentary evidence, the Court makes the following findings of credibility and fact:

The Court, as finder of fact, must assess the credibility of the witnesses and decide the facts of the case. In evaluating the credibility of the witnesses, the Eleventh Circuit Pattern Jury Instruction relating to witness credibility is a helpful place to start. "You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part." Eleventh Circuit Pattern Jury Instruction 3.4.

Four witnesses testified live during the trial. Mr. McIlwain, Ms. Sirna and Ms. Siemens in a clear and direct manner. The Court finds them to be credible and persuasive witnesses. Their testimony was consistent with the witnesses testifying via deposition and established a believable narrative.

The Court reaches a different conclusion concerning Ms. Patterson's testimony. As a witness, Ms. Patterson was evasive and, at times, downright unbelievable. For instance, Ms. Patterson's testimony that she simultaneously maintained multiple full-time professional jobs in different cities and states over a period of some eleven years is simply beyond the pale. Never mind that several of the actual jobs Ms. Patterson worked were omitted from her resume and employment application provided to Georgia Pacific in favor of the unverifiable fictional job(s) with the "APF" entities. Or even the fact that she owned multiple "APF" entities in the State of Louisiana during this time. Ms. Patterson had no credible response to these key facts relating to her employment history, work experience and credibility.

As a result of the Court's determinations of credibility, the facts to be considered are those presented via the testimony of Mr. McIlwain, Ms. Sirna and Ms. Siemens in addition to the deposition testimony at trial as summarized herein above.

### E.  Legal Overview

To prove a claim of retaliation in violation of Title VII, Plaintiff must prove that (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). Claims of intentional discrimination arise out of Title VII's "disparate treatment" provision, which provides, in relevant part, that it is "unlawful" for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . .." 42 U.S.C. § 2000e-2(a)(1). To prevail on such a claim, a plaintiff must prove "the employer intended to discriminate" against her. *Armstrong v. Flowers Hosp.*, 33 F.3d 1308, 1313 (11th Cir. 1994).

Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The first part of that provision, ending at the first comma in the quotation, is called the "opposition clause." *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). The second part is called the "participation clause." *Id.*

The burden shifting framework is applied to Title VII retaliation claims. *Id*. at 1135. The plaintiff must first make out a prima facie case of retaliation, showing "(1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Id*. at 1134 (quotation marks omitted). If the plaintiff can establish that, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason or reasons for the retaliation. *Id*. at 1135. If the employer does, the plaintiff must show that each reason is merely a pretext and that the real reason was retaliation. *Id*.

**F.  Analysis**

Based on the Court's assessment of the witnesses' testimony above, the application of the facts to the law is simple.

1.  The Court does not find Ms. Patterson satisfied her prima facie case. It is far from clear that anyone at Georgia Pacific knew Ms. Patterson was engaging in protected activity when she testified in the deposition in Pensacola, Florida on June 29, 2017. Mr. Hawkins thought she was involved in a follow up activity for the mill or just visiting her family in Pensacola. Additionally, the most Ms. Patterson ever offered concerning the nature of her "protected activity" consisted of was the observation that she testified against her former employer. As it happens, this former employer that had terminated her and came to believe she fabricated her work history when applying for employment.

2.  Even if there was sufficient evidence Ms. Patterson had engaged in protected activity, the Court does not find sufficient evidence that Ms. Patterson's termination was causally related to the protected activity. Since the Court has concerns about the credibility of Ms. Patterson's testimony generally, her recollection that Mr. Hawkins questioned her about

the deposition against her former employer and stated that it "made things clear" to him is suspect. There is no other evidence supporting Ms. Patterson's claims other than the proximity of the deposition to Ms. Patterson's termination. The Court is not persuaded by this temporal proximity alone.

3. But even if the Court were satisfied Ms. Patterson had met the prima facie elements of her claim, the Court finds that Defendants have articulated a legitimate non-discriminatory reason for her termination. The Court finds that the evidence supports Defendants' position that Ms. Patterson was terminated based on the loss of confidence in her leadership brought about by her absence from the mill and her job performance culminating with her failure to patriciate in the union avoidance project. Ms. Patterson did not offer any evidence suggesting the reasons articulated by Defendants were pretextual.

4. Even if Ms. Patterson had tried and succeeded in demonstrating Defendants' reasons for her termination were mere pretext, she completely failed to present evidence supporting her damages at trial. A plaintiff seeking to recover must do more than present a stack of "Indeed" job applications and incomplete and redacted tax transcripts.

5. Even if Ms. Patterson had prevailed on her claims, the Court finds that Defendants offered unrefuted evidence supporting their affirmative defense of after-acquired evidence. The testimony of Ms. Siemens established the misrepresentations and omissions in Ms. Patterson's work history and experience. Ms. Sirna testified that Ms. Patterson would not have been hired if she did not have the long history of employment as a director of human relations for a large manufacturing entity. Ms. Sirna further testified that an employee

who was found to have made material misrepresentations in their application for employment would be terminated. Ms. Patterson offered nothing in response to this testimony. Consequently, the Court would find in favor of the Defendants on their affirmative defense.

## III.    CONCLUSION

For all of the reasons set forth above, the Court finds in favor of Defendants. The Clerk of the Court is DIRECTED to enter FINAL JUDGMENT in Defendants' favor.

**DONE and ORDERED** this 31st day of March, 2025.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE